SLEMMONS, APPELLEE, *v.* CIBA-GEIGY CORPORATION,
APPELLANT; LOGAN COUNTY FARM BUREAU CO-OP ASSN.,
APPELLEE.*

[Cite as Slemmons v. Ciba-Geigy Corp. (1978),
57 Ohio App. 2d 43.]

(No. 8-77-8—Decided March 10, 1978.)

*Messrs. Kelly & Traul,* for appellee.
*Messrs. Jones, Day, Reavis & Pogue, Mr. Marc L.
Swartzbaugh, Mr. Hugh R. Whiting,* and *Messrs. Cory,
Boesel, Leonard & Witter,* for appellant Ciba-Geigy Cor-
poration.
*Messrs. Smith, Smith & Montgomery,* for appellee Lo-
gan County Farm Bureau Co-op Assn.

GUERNSEY, J. Plaintiff Frank Slemmons, a farmer,
brought an action for money in the Bellefontaine Munici-
pal Court seeking to recover damages claimed to have been
incurred by reason of a failure of his 1974 corn crop on
three separate tracts of land which he was farming. He
joined as defendants Ciba-Geigy Corporation, the manu-
facturer of certain chemical herbicides which were spray-
ed on his lands as a part of a tank spray also consisting
of water and liquid fertilizer, and Logan County Farm
Bureau Co-Op Association, which furnished the tank spray
and did the spraying. Farm Bureau made a cross-claim
against the manufacturer for indemnification.

Although the evidence was conflicting, so that rea-
sonable minds might differ as to the conclusions to be

---

*Reporter's Note: An appeal to the Supreme Court of Ohio was
dismissed by the parties May 19, 1978.

drawn therefrom, there was sufficient credible evidence of probative value to permit the trial court, which tried the case without a jury, to find, as it did, as follows:

"Plaintiff engaged in 'no-till' planting; no pre-planting plowing was done, nor any post-emergent cultivating performed. Reliance is entirely on the herbicide program to control weeds. Further, plaintiff wanted to plant beans in the following year (1975) [on a fifty acre tract] and thus wanted no 'carryover' damage to the planned bean crop. All of this was disclosed to defendant Farm Bureau. Because of the 1973 difficulty, and because plaintiff planned to follow the 1974 corn crop with beans in 1975, the Farm Bureau told plaintiff that it would have to confer with the manufacturer and then did explain plaintiff's problem to defendant CIBA-GEIGY.

"On March 21, 1974, a representative of CIBA-GEIGY called on the Farm Bureau and, after the Farm Bureau explained the 1973 experience and the plan of plaintiff to plant corn in 1974 followed by beans in 1975, made recommendation that a certain combination of chemicals be used.

"Plaintiff relied on the skill and judgment of the defendants. The herbicides were prepared and applied by the Farm Bureau. At no time did plaintiff have possession of the chemicals or the packages or bags in which the chemicals were delivered to the Farm Bureau.

"Three fields are in question: a fifty acre tract, a forty-two acre tract, and a fifteen acre field. Defendant CIBA-GEIGY made the recommendation of one and one-half pounds Aatrex and one and one-half pounds Princep, only in reference to the fifty acre tract.

"The Farm Bureau, assuming that the fields were similar, made the decision, without any discussion with CIBA-GEIGY, to make the same application of herbicides on the forty-two acre field. (one and one-half pounds per acre of Aatrex and Princep) The Farm Bureau alone selected the herbicides for the third tract, the fifteen acre field. The fifteen acre tract was to be treated with five pounds per acre of Aatrex, one gallon of 'Barbel', another

herbicide, and two thousand eight hundred ten (2810)
pounds of nitrogen. The fifteen acre tract was treated on
May 23, 1974; the Farm Bureau performed the applica-
tion, but had enough chemicals only to cover twelve acres;
on June 1, 1974, the Farm Bureau returned and applied a
total of ten pounds of Aatrex, one quart of Barbel and
no Paraquat or nitrogen to the remaining three acres.
Only these three acres failed to yield properly.

"The loss of production was thirty-five (35) bushels
per acre on the fifty (50) acre tract, fifteen (15) bushels
per acre on the forty-two (42) acres, and eighty (80) bush-
els per acre on the three (3) acre portion of the fifteen
(15)acre field. The price of corn was $3.28 per bushel.
* * * "

The trial court also concluded:

"The cause of the loss in production was the failure
of the recommended herbicidal program. Such finding is
compelled by the evidence including plaintiff's experience
in 1973, when five pounds per acre of Aatrazine were need-
ed to control weeds, by the fact five pounds per acre of
Aatrex was applied successfully in 1974 to the twelve acre
portion of the fifteen acre tract, by the fact that only one
and one-half pounds per acre were applied, as recommend-
ed, in 1974, and by the presence in the fall of 1974 of chest-
high weeds in the three acre tract, where a total of ten
pounds of Aatrex were applied in 1974 (a little over three
pounds per acre), and of extensive weeds in both the
fifty acre and forty-two acre tracts on which the recom-
mended one and one-half pounds of Aatrex and Princep
were applied."

On the basis of these findings of fact the trial court
rendered judgment in favor of the plaintiff and against
the defendant Farm Bureau for the total amount of the
plaintiff's loss, i. e., bushels lost multiplied by price per
bushel, less a credit to Farm Bureau for money due from
plaintiff on another account. No judgment was rendered
for plaintiff against the defendant manufacturer. Farm
Bureau having cross-claimed against the manufacturer
for indemnification of any damages which plaintiff farmer

might recover against Farm Bureau, the court awarded judgment to Farm Bureau against the manufacturer to the extent plaintiff's judgment against Farm Bureau pertained to crop loss on the 50 acre tract, "the only field on which CIBA-GEIGY made a recommendation."

From this judgment the manufacturer first appealed assigning error of the trial court (1) in that the judgment in favor of plaintiff and against Farm Bureau for consequential damages "on the theory of breach of implied warranty" is contrary to law and against the manifest weight of the evidence, and (2) in that the judgment in favor of Farm Bureau against the manufacturer for a portion of such consequential damages on an indemnity theory is contrary to law and against the manifest weight of the evidence.

From this judgment Farm Bureau also filed its notice of appeal one day after the appeal of the manufacturer assigning error of the trial court (1) in that its judgment is not supported by and is against the weight of the evidence by reason of errors (A) in finding a breach of an implied warranty of fitness under R. C. 1302.28, (B) in finding that the loss in production of corn was proximately caused by a failure of the weed control program, (C) in that the plaintiff failed to establish his loss in yield by a preponderance of the evidence, and (D) in finding that the manufacturer was not liable to Farm Bureau with respect to the 42 acre and the 15 acre tracts of land; (2) in that plaintiff's own conduct precludes his recovery; and (3) in that plaintiff's failure to comply with the notice provisions of R. C. 1302.65(C)(1) precludes his recovery.

R. C. 1302.28 prescribes:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose."

An implied warranty of fitness for purpose has to do

with the intrinsic qualities and characteristics of the property sold and must be reasonably construed in the light of common knowledge with respect to the nature of the article sold. 77 Corpus Juris Secundum 1178, Sales, Section 325. Here there wasn't any evidence, except such inference as might arise from results, that the herbicides manufactured by defendant manufacturer did not consist of exactly the chemicals which they purported to be, *i. e.*, a herbicide which when used at a suitable time, under suitable conditions and in suitable quantities would sufficiently inhibit the growth of weeds and grasses so as to make tillage for such purpose unnecessary. However, we are not concerned with whether there was an implied warranty as to fitness for purpose made by the manufacturer which would support a judgment by plaintiff against the manufacturer. There was no judgment for plaintiff against the manufacturer and plaintiff did not appeal from that situation.

We have a different situation as to Farm Bureau. It sold to plaintiff quantities of herbicide and other chemicals mixed together in a tank mix and sprayed by Farm Bureau upon plaintiff's lands. There was evidence upon which it could be properly concluded, and the trial court did conclude, that at the time of contracting between the plaintiff and the defendant Farm Bureau, Farm Bureau knew the particular purpose for which the tank mix which it sold and delivered to plaintiff was required and similarly evidence upon which it could be properly concluded, as the trial court did conclude, that the plaintiff relied on Farm Bureau's skill or judgment to select or furnish a tank mix of chemical makeup and quantities suitable for the purpose of inhibiting the growth of weeds and grasses on plaintiff's lands so as to make tillage for such purpose unnecessary in the production of corn on such lands, keeping in mind that the 50 acre tract had received a "double" dose of herbicide during the 1973 crop year and that the plaintiff desired to rotate to beans during the 1975 crop year. This particular purpose and the plaintiff's reliance were well within the knowledge of Farm Bureau at the time and it is the furnishing of the goods with such know-

ledge which raises the implied warranty on which Farm Bureau's liability to plaintiff is based.

Branch A of Farm Bureau's first assignment of error is, therefore, without merit.

Branch B of Farm Bureau's first assignment of error is based on the argument that there was substantial evidence of record indicating that a large number of factors other than the herbicide application and beyond the control of Farm Bureau contributed to the reduced crop and, accordingly, that plaintiff did not establish by a preponderance of the evidence that it was, in fact, a breach of the implied warranty of fitness for purpose which resulted in the reduced yield.

There is no question that there was evidence as to the existence of other conditions or factors which might have had an adverse effect on the crop yield. Proximate cause, however, is usually a matter solely for the trier of fact and seldom is determined as a matter of law and then only, when the evidence is conclusive on the issue.

The court's finding as to proximate cause was based on a sound, but not necessarily conclusive, rationale, i. e., that where there existed reason to exclude the operation of other factors the obtaining of a full crop on the 12 acre portion of the 15 acre field where 5 pounds of Aatrex per acre was applied and the failure of the corn crop on the other fields where three pounds, or less, per acre of Aatrex, or its equivalent, was used, proved that the crop loss on these latter fields was due to an insufficient quantity of atrazine being applied.

The court could logically and properly reject the effect of dryness because there was no evidence that the other fields (including the fields of neighbors) received any less rain or received rain at different times than did the 12 acre portion of the 15 acre field.

The court could properly reject the effect of soil trampling by cattle pastured on the 50 acre field before planting because cattle were not pasturerd on other fields where the crop failed and, in any event, a coulter was used in planting which loosened the soil around the seed corn.

The court, could logically and properly reject the effect of diminished nitrogen available and used during the crop year because this had no adverse effect on the 12 acre portion of the 15 acre field or on the successful crops of neighobors.

The court could logically and properly reject the effect that Farm Bureau's lack of control over the effectiveness and skill of the planting or harvesting, or the field condition or preparation, would have because the plaintiff had control over the factors in all of his fields, including the 12 acre portion of the 15 acre tract where a successful crop was had as well as the fields where the corn crop failed. Nor was there any convincing evidence as to the lack of effectiveness or skill of plaintiff in accomplishing these operations.

The court could logically and properly reject any effect which differences in soil or soil conditions would have on the crop yield because there was no evidence of probative value that the soil in the 12 acre portion of the 15 acre tract was substantially different or more productive than that in the other tracts.

Farm Bureau then says that an "additional factor beyond the Farm Bureau's control is the possibility that the products involved simply did not work." We assume that this means that the products would be ineffective in any quantity. If so, this would not be chargeable to plaintiff but would be chargeable to Farm Bureau which furnished the products.

It then cites as the most important factor affecting the yield as being the choice which plaintiff made to follow his corn crop with beans. That may well be, and probably is, the cause which led to three pounds of atrazine (Aatrex or Princep) being applied to the 50 and the 42 acre fields but again this was done on Farm Bureau's recommendation with Farm Bureau knowing that plaintiff was relying on such recommendation to produce a successful crop.

We find no error in the court's finding as to proximate cause and that Branch B of Farm Bureau's first assignment of error is without merit.

Branch C thereof constitutes a claim that plaintiff failed to establish his loss in yield because the yield of his neighbors was based on different factors. As pointed out heretofore the trial court did not base his conclusions as to successful yield on the neighbor's production but, instead, based his conclusions as to successful yield on the 12 acre portion of the 15 acre tract farmed by plaintiff. The record does not, therefore, portray this claim and same is without merit.

Ciba-Geigy's first assignment of error is based on two claims, (1) that plaintiff is precluded from recovery against Farm Bureau on an implied warranty theory because of his failure to give to it the notice required by R. C. 1302.65, and (2) that there is no evidence to indicate, as required, that plaintiff's reduced yield resulted more probably than not from a defect in the herbicide.

The second of these claims we have substantially disposed of by our discussion of Branch B of Farm Bureau's first assignment of error. As to the additional claim relating to product defect we have noted heretofore, consistently with the manufacturer's claim, that there was no evidence in the record that the herbicide, as such, was defective. The problem, however, is not with the herbicide as furnished by the manufacturer, but as to the tank mix as furnished by Farm Bureau. Based on the court's conclusions of fact, which are supported by the evidence, that mix was not fit for the purpose for which the plaintiff required same because it did not contain a sufficient quantity of atrazine, when applied to plaintiff's 50 acre tract, his 42 acre tract, and the 3 acre portion of his 15 acre tract to inhibit the production of grass and weeds enough to eliminate the requirement of tilling the soil to produce a successful corn crop. We find Branch 2 of the manufacturer's first assignment of error without merit.

Branch 1 of the manufacturer's first assignment of error is identical with Farm Bureau's third assignment of error.

R. C. 1302.65(C) prescribes:

"Where a tender has been accepted:

"(1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; * * * ."

There was no evidence that the plaintiff discovered any breach of Farm Bureau's implied warranty of fitness for purpose until it was too late to correct the condition, i. e., the weeds and grasses were fully grown. The question then is, whether the plaintiff should have discovered the condition at an earlier time? Discovery connotes the finding out of something hitherto unknown. The phrase, "should have discovered," is not equivalent to "could have discovered," does not necessarily carry with it a duty to seek out the condition to which the discovery pertains, but it connotes, instead, that if the condition is so obvious as to be apparent in the normal exercise of the perceptory senses then that condition may not be considered overlooked or not observed. This distinction is particularly applicable to a situation, as here, where the farmer relied on the expertise of Farm Bureau, the seller, as to the fitness of the tank mix for the purpose for which it was purchased and used and, relying on its effectiveness, was not charged with any duty to actively and constantly check for its ineffectiveness. There was no evidence in the record that the weed and grass condition was so obvious that plaintiff should have discovered it any sooner than he did discover it.

The existence of a similar condition a year earlier which was observable to and was actually discovered by plaintiff did not increase plaintiff's duty to discover the weed and grass condition in 1974. Indeed, a year earlier the variables which then existed relating to growth both of corn and weeds and grass may have been such that plaintiff was motivated by some reason not applicable to reliance on herbicide to check his field.

It appears then that there was no evidence requiring a conclusion that plaintiff should have discovered the weed and grass condition at any earlier time than when he did discover it. There was evidence that within a reasonable time after he discovered the condition and the resultant

effect on his corn production he gave notice to Farm Bureau and that the field was thereafter inspected by a representative of the manufacturer. There was no evidence that notice could have been given at any time early enough that corrective measures could have been taken.

It is implicit in the trial court's judgment that all notice requirements precedent to suit were satisfied. We find no evidence which requires us to conclude otherwise and the manufacturer's first branch of its first assignment of error and Farm Bureau's third assignment of error are without merit.

We come then to Farm Bureau's second assignment of error dealing with "plaintiff's own conduct and negligence."

Farm Bureau's arguments under this assignment of error have been substantially answered by our discussion and disposition of the foregoing assignments of error. Additionally, however, it must be emphasized that this is a breach of warranty case, sounding in contract rather than in negligence, and many authorities hold contributory negligence not to be a defense. 77 Corpus Juris Secundum 1266, Sales, Section 357. Causation seems to be the key. To the degree that damages are incurred solely by reason of the breach of warranty the negligence of plaintiff is not an effective defense.

To the degree that the crop loss resulted from the negligence of plaintiff, and not from the breach of warranty, plaintiff could not, of course, recover. Regardless of plaintiff's expertise or his understanding of his problem, which included the heavy 1973 applications of herbicide to the 50 acre tract and his desire to rotate to beans in 1975, plaintiff had a right to rely on Farm Bureau to furnish him goods fit for the purpose and, knowing of the purpose and that plaintiff was relying on its skill or judgment, by proceeding to furnish the tank spray of the herbicide mix which it did, Farm Bureau contractually exposed itself to the implied warranty set forth in the statute. The evidence was such that the trial court was permitted to find that breach of this implied warranty proximately caused

all of plaintiff's loss independently of what might have been considered careless, if not negligent, conduct on the part of plaintiff. We cannot, as a matter of law, find otherwise. This assignment of error is without merit.

Branch D of Farm Bureau's first assignment of error and the manufacturer's second assignment of error deal with the same issue—indemnification, Farm Bureau claiming that the court erred in not requiring the manufacturer to indemnify it for all of plaintiff's loss as established by plaintiff's judgment against Farm Bureau, and the manufacturer claiming that the trial court committed error by requiring it to indemnify part of that loss.

As has been observed there is no evidence in the record that the herbicide here involved was intrinsically defective and unfit, as to quality, to accomplish the purpose for which plaintiff desired to use it. The trial court's factual conclusion is based on an insufficiency of quantity and on the evidence we cannot conclude otherwise as a matter of law. In these circumstances indemnification of Farm Bureau by the manufacturer must rest, if at all, on such participation, if any, that the manufacturer had in the determination of the quantities used by Farm Bureau in preparing the tank mix. Farm Bureau claims that it relied on the specific recommendations of a manufacturer's fieldman or representative in determining the quantity of herbicide to be used on the 50 acre tract and additionally, as a distributor of the manufacturer, relied on the manufacturer for its information as to the rate of applications including reliance on rate information published by the manufacturer.

The testimony of the representative of the manufacturer, on the other hand, is not so specific. He equivocates as to having advised Farm Bureau as to the particular farm in question but admits merely advising it in general terms as to the problem which Farm Bureau sought information about without knowing that it involved plaintiff or his farm. Weighing this evidence the trial court concluded that the farm bureau had conferred with the manufacturer and relied on its expertise as to the 50 acre field but not as to the others and rested its liability for indemnification accord-

ingly, citing for its authority for this theory of indemnity the case of *Dobias* v. *Western Farmers Association* (Wash. App. 1971), 491 P. 2d 1346, which is also cited by Farm Bureau.

The *Dobias* case, however, has to be distinguished from the situation here because the product or "goods" involved in that case was actually intrinsically deleterious to the crop, a fact which the manufacturer misrepresented to the retailer who in turn passed the manufacturer's information on to the farmer.

Factually the case is closer to *Wilson* v. *E-Z Flo Chemical Co.* (N. C. 1972), 189 S. E. 2d 221, where the court recognized the rule that where the retailer purchases goods from the manufacturer for resale with an implied warranty of fitness and resells to the consumer with the same warranty and has been compelled to pay for breach of warranty, the retailer may recover his entire loss from the manufacturer. The court found, however, that the rule was not applicable as between the manufacturer who warned and the distributor who has been warned as to product limitations but fails to pass the warning on to the user.

The following appears on the outside of the Aatrex container and in the leaflet accompanying the Princep container offered in evidence by defendant manufacturer:

*"Conditions of Sale and Warranty*

"The *Directions for Use* of this product reflect the opinion of experts based on field use and tests. The directions are believed to be reliable and should be followed carefully. However, it is impossible to eliminate all risks inherently associated with use of this product. Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials or the manner of use or application all of which are beyond the control of CIBA-GEIGY or the Seller. All such risks shall be assumed by the Buyer.

"CIBA-GEIGY warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes referred to in the *Directions for Use*, subject to the inherent risks referred to above. *CIBA-GEIGY makes no other express or implied warranty of*

*Fitness or Merchantability or any other express or implied warranty.* In no case shall CIBA-GEIGY or the Seller be liable for consequential, special or indirect damages resulting from the use or handling of this product. CIBA-GEIGY and the Seller offer this product and the Buyer and user accept it, subject to the foregoing *Conditions of Sale and Warranty* which may be varied only by agreement in writing signed by a duly authorized representative of CIBA-GEIGY."

Although admitted into evidence pursuant to the testimony of a manufacturer's witness to the effect that such containers were used during 1974, the trial court concluded that there was no evidence that "the disclaimers were known by or assented to by * * * the defendant Farm Bureau." This conclusion of the trial court is unwarranted and contrary to fact for in the transcript the involved representative of Farm Bureau testifies:

"Q. Do you recognize these as being containers in which Ciba-Geigy products known as Aatrex and Princep were supplied?

"A. Yes sir.

"Q. Were you familiar with in 1974, the language written on each of these containers?

"A. Familiar yes.

"Q. Had you read it?

"A. Yes.

"Q. You knew then what the label language provided?

"A. General speaking yes.

"Q. And you recognized that as being part of the instructions and language provided to you as a dealer by Ciba-Geigy?

"A. Yes."

Thus, even if a purchaser of products could be free of warranty limitations or disclaimer plainly set forth on the product container by not reading same or by denying knowledge or assent to same, a somewhat doubtful doctrine, there is affirmative and conclusive evidence here that Farm Bureau was fully aware of same and, dealing in the product, assented to and was charged with same.

Accordingly, both by limitations and disclaimer Farm

Bureau was warned, in essence, that there was no guarantee that the product would, in all events, produce a successful crop. So considered, the situation here comes fully within the exception to liability set forth in the *Wilson* case. Additionally, the retailer in *Wilson* was merely a conduit for the product in that the farmer there involved applied the herbicide himself. Here, the farmer neither applied the herbicide himself nor as we have pointed out earlier, was there an implied warranty by the manufacturer of fitness for purpose which had been breached, there being no proof of an inherent defect in the product. Notwithstanding that in that portion of its decision labeled "findings of fact" the trial court concludes that there was a "failure of the recommended herbicidal program," based on its analysis that insufficient herbicide was applied to the fields where the crop failed, the trial court apparently inconsistently concludes in that part of its decision labeled "discussion and conclusions of law" that it had found "as matter of fact, that the herbicides recommended were not fit for the purpose of controlling the weeds in the fields in question and that the failure of the herbicide program caused the damages in the form of the reduced yield." However, since the trial court did not find as a matter of fact that there was an intrinsic defect in the product and since there was no evidence of such intrinsic defect, we must conclude that the herbicides recommended that were not fit for the purpose of controlling the weeds were the herbicides present in the tank mix furnished by Farm Bureau which were not fit because of insufficient strength and not those sold by the manufacturer to Farm Bureau. This conclusion is also inevitable since the trial court did not render judgment for the plaintiff against the manufacturer.

If it could be said that without a disclaimer of warranty the manufacturer would have impliedly warranted the herbicide as fit for the purpose then the warranty language under "Conditions of Sale and Warranty" excepting the factors which might cause crop failure of "weather conditions, presence of other materials or the manner of use or application," would sufficiently except from warranty

crop failure resulting from a manner of use consisting of application in insufficient strength. This, of course, is one of the risks referred to in the express warranty that the product "is reasonably fit for the purposes referred to in the directions for use, subject to the inherent risks referred to above."

In addition to implied and express warranty limitations and disclaimers the printed matter on the manufacturer's container also excludes liability for consequential damages, which is the character of the damages sought by and awarded to plaintiff against Farm Bureau. R. C. 1302.93(C) permits such exclusion "unless the limitation or exclusion is unconscionable," and further provides that where the loss is commercial limitation of consequential damages is not *prima facie* unconscionable. We find nothing in the record before us constituting conclusive proof that the exclusion here was, as to the issue of indemnification, unconscionable.

Thus, from the standpoint of the mere relationship existing between Farm Bureau and the manufacturer and from the standpoint of the printed limitations on and disclaimers of warranty and the limitations on consequential damages appearing on or with the product container we would have to conclude that the manufacturer is not required to indemnify Farm Bureau for any of the damages which Farm Bureau is required to pay to plaintiff.

The important other factor, however, which exists and must be further considered is the visit by a field representative to Farm Bureau in March of 1974 and his general recommendation to Farm Bureau in answer to questions posed to him by Farm Bureau as to the plaintiff's otherwise than normal problem of a double application of atrazine, or its equivalent, to the 50 acre field in 1974, by reason of excessive weeds during the growing season and the plaintiff's desire to rotate to beans in the 1975 crop year, that the application of a certain quantity or strength of herbicide would be appropriate to such problem. Expert testimony shows that this advice was reasonably consistent with the state of the general knowledge existing at the time in question and Farm Bureau has not shown

otherwise. It is acknowledged, however, that the field representative was not invited to visit nor did he visit the field in question to consider any of the variables such as soil type, drainage, existing growth, etc., which might have indicated the suitability of a different recommendation, nor was he even advised as to the identity of the farmer involved. Thus we have a situation where Farm Bureau relied on the field representative only for general recommendations related to a general problem and relied on its own judgment as to the effect of any of the special factors which existed on or concerning the land. In our opinion the recommendations of the field representative in these circumstances created no liability in the manufacturer to indemnify Farm Bureau.

Accordingly, we conclude that the trial court committed no error as assigned by Farm Bureau in Branch D of its first assignment of error, but committed error prejudicial to the manufacturer as assigned by it in its second assignment of error.

For the foregoing reasons that part of the judgment of the Bellefontaine Muncipal Court as to the liability of Farm Bureau for plaintiff's damages and as to the non-liability of the manufacturer to indemnify Farm Bureau for damages respecting the 42 acre and 15 acre tracts must be affirmed. That part of its judgment as to indemnification due from the manufacturer to Farm Bureau for the damages relating to the 50 acre tract must be reversed and this Court, rendering the judgment on that issue which the trial court should have rendered, finds for the manufacturer and against Farm Bureau.

*Judgment accordingly.*

MILLER, P. J., and COLE, J., concur.