Melvin M. MOORER, Jr., et al., Plaintiffs,

v.

HARTZ SEED COMPANY, et al., Defendants.

No. CIV.A. 99–A–988–N.

United States District Court, M.D. Alabama, Northern Division.

Nov. 7, 2000.

Rhon E. Jones, Thomas J. Methvin, De-Lacie Hester, Beasley, Allen, Crow, Methvin, Portis & Miles, PC, Montgomery, AL, Lynn W. Jinks, III, Jinks, Daniel, Crow & Seaborn, LLC, Union Springs, for Melvin M. Moorer, Jr., Moorer Seed Company, plaintiffs.

Harlan I. Prater, IV, Jere F. White, Jr., Lightfoot, Franklin & White, L.L.C., Birmingham, AL, Cowin Knowles, Ball, Ball, Matthews & Novak, P.A., Montgomery, Wayne K. McNeil, Frilot, Partridge, Kohnke & Clements, New Orleans, LA, C.D. Nolan, Jr., Nolan Law Firm, Stutgart, AR, for Hartz Seed Company, Monsanto Company, defendants.

### MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This cause is before the court on a Motion for Summary Judgment, filed by Defendants Hartz Seed Company ("Hartz") and Monsanto Company ("Monsanto") (collectively, the "Defendants") on July 28, 2000 (doc. # 49).

Moorer Seed Company ("MSC") and Melvin M. Moorer, Jr. ("Moorer, Jr.") (collectively, the "Plaintiffs") originally filed their Complaint in the Circuit Court of Autauga County, Alabama on August 5, 1999, alleging various state law claims. Defendants removed the case to this court on September 3, 1999, pursuant to 28 U.S.C. §§ 1332, 1441(a)(1), and 1446. Plaintiffs filed an Amended Complaint on January 14, 2000. Count one is based on breach of warranty of merchantability; count two on breach of express warranty; count three on breach of implied warranty of fitness; count four on breach of contract; count five on fraudulent misrepresentation; count six on fraudulent suppression; count seven on negligent and wanton fraud; and counts eight through thirteen on various state and federal seed laws.

The Defendants' Motion for Summary Judgment seeks to dismiss both Moorer, Jr. and MSC from this action on the grounds that they are improper parties and/or lack standing to sue. Alternatively, the Defendants allege that they are due summary judgment as a matter of law as to all claims except those enumerated in counts two and four of the Plaintiffs' Amended Complaint.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in part.

### II. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the nonmoving party has responded to the *motion for summary judgment*, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

MSC is a sole proprietorship owned by Mrs. Francis G. Moorer. Mrs. Moorer's son, Moorer, Jr., is the day-to-day manager of the business. MSC is primarily a seed cleaning operation, but it also purchases beans and seeds to plant, harvest, and sell.

On behalf of MSC, Moorer, Jr. met with Malcolm Dye and Ray Owen, representatives of Defendant Hartz, to discuss the purchase of soybean seeds from Hartz. Moorer, Jr. states that Malcolm Dye told him that any seeds purchased from Hartz would be of "certified quality or better." Moorer, Jr. Dep. at 66, ln. 19. The parties entered into a contract, and Malcolm Dye recommended and selected H507 variety soybeans for MSC. MSC took receipt of the seeds in May of 1998. These seeds were promptly picked up by five farmers with whom Moorer, Jr. had contracted to grow the soybeans. The agreement provided that the farmers plant, harvest, and return the soybeans to MSC, whereupon MSC would pay the farmers for their services. Moorer, Jr. would then return the harvested H507s to Defendant Hartz. At that time, Hartz would pay MSC for its services less the cost of the beans.

Shortly after planting, Moorer, Jr. received complaints from three farmers that the seeds were not germinating properly. Moorer, Jr. contacted Hartz, and replacement seeds were sent to MSC. Only one of the farmers used the replacement seed, and his attempt to do so was unsuccessful.

The claims now brought against the Defendants arise from this factual background. The basic premise underlying the Plaintiffs' claims is that Hartz sold substandard seed to MSC.

## IV. DISCUSSION

As stated earlier, Plaintiffs seek to hold the Defendants liable on multiple theories of recovery. Defendants have moved for summary judgment on most of these claims. In addition, Defendants argue as a threshold matter that both MSC and Moorer, Jr. are improper parties to this action.

### A. Capacity of MSC to Sue

The Defendants argue that it is improper for this suit to be maintained in the name of MSC. They contend that MSC is a sole proprietorship, and that as such, a suit by MSC must be brought in the name of the individual owner of the sole proprietorship, Mrs. Moorer. In essence, the Defendants embrace the notion that a sole proprietor cannot maintain an action relating to the sole proprietorship only in the name of the sole proprietorship.

■ Federal Rule of Civil Procedure 17(b) states in relevant part:

> The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. *In all other cases capacity to sue or be sued shall be determined by the law of the*

*state in which the district court is held . . .*

Fed.R.Civ.P. 17(b) (emphasis added). Accordingly, this court looks to Alabama law to determine whether suit only in the name of MSC is proper.

██ Under Alabama law, a sole proprietor and its owner are "but a single legal entity." *Clardy v. Sanders,* 551 So.2d 1057, 1059–60 (Ala.1989). The proprietor and the proprietorship have no separate legal identity. By way of example, any judgment for or against MSC would be a judgment for or against Mrs. Moorer.

There is no Alabama authority directly addressing the issue of whether an individual can maintain a suit only in the name of a sole proprietorship. However, the Supreme Court of Alabama has held that a judgment entered against a sole proprietorship, where the individual owner has been personally served with process, is a judgment against the individual owner. *See Hughes v. Cox,* 601 So.2d 465 (Ala. 1992). Though factually dissimilar, the *Hughes* case provides needed guidance to this court.

In *Hughes,* plaintiffs filed a complaint against "Hughes Realty of Clanton, Alabama," a sole proprietorship. *Hughes,* 601 So.2d at 467. The sole proprietor, Gearlene Hughes, was personally served, but was not named in the complaint. *See id.* Later, plaintiffs amended their complaint, substituting "Gearlene Hughes, d/b/a Hughes Realty or Hughes Realty of Clanton," for "Hughes Realty of Clanton, Alabama." *Id.* However, Gearlene Hughes was not served with a copy of the amended complaint. A default judgment was entered against Gearlene Hughes and she appealed, arguing that the judgment could not stand because the sole proprietorship was not a suable entity. *See id.*

The Supreme Court of Alabama rejected Hughes' argument, noting that "[a]bsent a statute to the contrary, an individual has the right to be known by any name that he

chooses, and a judgment entered for or against that individual in either an assumed name or a trade name is valid." *Id.* at 471 (citing 49 C.J.S. *Judgments* § 75, p. 197 (1947)). In *Hughes,* the individual proprietor was not in any way prejudiced by the fact that the original complaint named only the sole proprietorship. She personally received process and was on notice of the lawsuit filed against her via her trade name.

In the case *sub judice,* a plaintiff rather than a defendant is named only by her trade name. That is, the suit has been brought by "MSC" instead of by "Frances Moorer d/b/a MSC." Under these facts, unlike those in *Hughes,* the delicate issue of service does not arise because the individual owner in this case is the plaintiff. Moreover, the Defendants make no argument that they have been prejudiced by the fact that the suit was brought only in the name of MSC. Therefore, as the *Hughes* court noted, a judgment for or against the individual in a trade name is valid and this court finds that MSC is a proper party to this action.

### B. *Moorer, Jr.*

██ Federal Rule of Civil Procedure 17(a) requires every civil action to be prosecuted in the name of the real party in interest. Fed.R.Civ.P. 17(a). The "real party in interest" principle is a means by which federal courts determine whether a party possesses an enforceable right. *See* 6A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d § 1542 (1990). The district courts look to the governing substantive law in reaching this determination. The present case having been removed on the basis of diversity jurisdiction, this court must look to Alabama law in ascertaining whether Moorer, Jr. is properly joined to this suit.

██ When an agent negotiates an agreement on behalf of his principal, the agent's ability to sue a third party based on the facts stemming from the negotiated

relationship is governed by agency law. *Cooper & Assoc., Inc. v. Central Life Assurance Co.*, 614 So.2d 982, 991 (Ala.1992). The general rule for both contract and tort suits is that an agent has no standing to sue, in his own name, a third party who has allegedly perpetrated some actionable wrong against the principal. *See Cooper*, 614 So.2d at 991 (adopting Restatement (Second) of *Agency* § 374(2) (1957)).

Section 374(2) states:

A servant or other agent has no action of tort because another has tortiously harmed the principal or destroyed its business, unless the other acted for the purpose of harming the agent's interests.

Restatement (Second) of *Agency* § 374(2) (1957).

Although not specifically adopted by the Supreme Court of Alabama in *Cooper*, section 363 of the same Restatement is an important corollary to section 374(2). It states:

An agent who makes a contract on behalf of a principal cannot maintain an action thereon in his own name on behalf of the principal although authorized by the principal to bring suit, unless the agent is a promisee or transferee.

Restatement (Second) of *Agency* § 363 (1957).

With these general principles in mind, the court turns to the facts of the instant case.

At all times relevant to this proceeding, Moorer, Jr. has been a salaried employee/manager of MSC. Frances Moorer Dep. at 36, lines 2–6. Although Moorer, Jr. signed the soybean contracts with Hartz, he did so in his capacity as an employee of his mother's proprietorship. The disputed contracts were clearly between MSC and the Defendants. *See* Def. Exh. F. The evidence before this court shows that Moorer, Jr. acted solely as an agent for

MSC. Under the general rules recited in the Restatement (Second) of *Agency*, it appears that Moorer, Jr. cannot proceed with either a contract or a tort claim against the Defendants based on the arrangement he brokered on behalf of MSC.

The Plaintiffs argue that under the standard adopted in *Cooper*, Moorer, Jr. may maintain an individual action against the Defendants because "the [Defendants] intended ... [Moorer, Jr.] to act on the fraudulent representations 'in a manner affecting' ...[Moorer, Jr.]." *Cooper*, 614 So.2d at 991. The difficulty with this approach is that it would allow virtually any employee "affected" by an adverse action taken against his employer to sue the adverse actor. This standard would, of course, lead to absurd results. That is precisely why the drafters of the Restatement (Second) of *Agency* included comment b. to section 374(2):

In conformity with the normal tort rule, a servant who loses his job or otherwise suffers economic loss as a result of the principal's misfortune, tortiously caused by another, has not thereby an action against the other. If, however, the other destroys the master's business in order to cause loss to the servant, the latter has a cause of action.

Restatement (Second) of *Agency* § 374(2) cmt. b. (1957).

This court concludes that, given the opportunity, the Supreme Court of Alabama would follow the direction of comment b., which is part and parcel of the section of the Restatement that was adopted by that court in *Cooper*. *See Cooper*, 614 So.2d at 993–94 (Maddox, J., dissenting) (noting the relevance of comment b. to any discussion of section 374(2)).[1]

Finally, this court relies on a hypothetical used by the Supreme Court of Alabama in the case of *Steiner v. Clisby*, 103 Ala.

---

**1.** The *Cooper* majority concluded that the agent in that case could maintain an individual action against the third party because there was evidence in the record suggesting that the

third party had intended to harm the agent personally. *See Cooper*, 614 So.2d at 992. Justice Maddox felt there was insufficient evidence to sustain that position. *See id.* at 994.

181, 15 So. 612, 615 (1894) while addressing a similar issue:

> If the false representation is made to A. to induce him to part with his money, and he does so, A. must sue; but, if made to him to induce B. to part with his, and B. is induced thereby to do so, he, and not A., is the party injured, who may maintain the action.

The injuries alleged in the Plaintiffs' Amended Complaint are to the sole proprietorship. There is no evidence in the record suggesting that the Defendants intended to harm Moorer, Jr. in his individual capacity. Moorer, Jr. acted solely as an agent of MSC, and it appears clearly from the record that the cause of action should belong only to MSC. Any harm done Moorer, Jr. was a consequence of his employment with MSC and is not cognizable. The real party in interest is MSC. Insofar as the Defendant's Motion for Summary Judgment is aimed at affecting the removal of Moorer, Jr. from this action, it is due to be GRANTED.

### C. *Implied Warranty Claims* (Counts One and Three)

■ Defendants assert that MSC's claims for breach of implied warranties must fail because any such warranties were validly disclaimed in the sales transaction documents. MSC responds that such disclaimers are at odds with the policy underlying Alabama's agricultural laws "which attempt to maintain soybean seed grown in this state at a merchantable quality." Pl. Resp. at 22. MSC also argues that such disclaimers are unreasonable, and thus, inoperative.

Alabama's version of the U.C.C. provides for both an implied warranty of merchantability and an implied warranty of fitness for a particular purpose. An implied warranty of merchantability arises in a contract for the sale of goods where the seller is a merchant with respect to the goods he is selling. *See Ala.Code* § 7–2–314 (1997). An implied warranty of fitness for a particular purpose arises when the

seller, at the time of contracting, has reason to know any particular purpose to which the buyer wishes to put the product, and also knows that the buyer is relying on the seller's expertise in selecting a suitable product for the buyer. *See Ala.Code* § 7–2–315 (1997). Both types of implied warranties may be disclaimed by the seller. *See Ala.Code* § 7–2–316 (1997).

A party may exclude or disclaim any implied warranty of merchantability or any implied warranty of fitness for a particular purpose by including the appropriate language of disclaimer in the contract or agreement. Section 7–2–316 of the Alabama Code provides in part:

> [T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which exist beyond the description on the face hereof." ... Unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty
> ...

*Ala.Code* § 7–2–316(2) and (3) (1997).

The Code defines "conspicuous" as follows:

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NONNEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color ... Whether a term or

clause is 'conspicuous' or not is for decision by the court.

*Ala.Code* § 7–1–201(10) (1997).

In the present case, each invoice accompanying seed delivered to MSC had the language **"ADDITIONAL TERMS, CONDITIONS, AND LIMITED WARRANTY ON BACK"** included just above the customer signature line. Def. Exh. F. On the back of the relevant invoices, the following language is found:

> **LIMITED WARRANTY AND LIMITATION OF LIABILITY 1. LIMITED WARRANTY.** Subject to Paragraph 2 and unless otherwise expressly provided herein, Seller warrants title and that the goods shall conform to the label description attached to the container within recognized tolerances under state and federal seed laws. Subject to the preceding sentence and except as otherwise expressly provided herein, SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER MATTER WITH RESPECT TO THE GOODS; including, without limitation, any warranty with respect to crop yields, or the response of the goods to environmental condition, disease, insect infestation, chemical application, farming practices or other growing conditions...

Def. Exh. F.

All of the invoices used by the Defendant Hartz were identical. The bold language on the front of the invoices informs the reader that terms and conditions dealing with limitation of warranties can be found on the back of the invoice. The provisions on the back of the invoice are preceded by the bold heading "LIMITED WARRANTY." The straightforward requirements of section 7–2–316 have been followed. *See Fleming Farms v. Dixie Ag Supply, Inc.*, 631 So.2d 922, 927 (Ala.1994).

Defendants have proffered uncontroverted evidence that the implied warranties of merchantability and fitness for a particular purpose were properly disclaimed in accordance with Alabama law. MSC has not presented any material issue of fact as to why summary judgment should not be granted the Defendants on the implied warranty claims. MSC argues, without supporting authority, that the disclaimer of implied warranties is unreasonable, that it violates public policy, and that it is therefore unenforceable. This court disagrees. Section 7–2–316 expressly permits such disclaimers so long as they meet certain requirements so as to protect buyers from surprise. *See Ala. Code* § 7–2–316 Official Comments 1 and 3 (1997). This particular limitation of warranty provision adheres to those requirements. Moreover, the policies supporting Alabama's agricultural seed standards are not undermined by the U.C.C. provisions governing the disclaimer of implied warranties. Whether a seed company disclaims implied warranties or not, it is still required by state law to comply with the standards set forth in the Alabama Code pertaining to seed quality. *See Ala.Code* § 2–26–1 *et seq.* (1999). The Defendants' Motion for Summary Judgment is due to be GRANTED as to MSC's claims for breach of implied warranties.

### D. *Fraud Claims* (Counts Five, Six, and Seven)

MSC has included three counts alleging fraud in its Amended Complaint. Count five is based on a theory of fraudulent misrepresentation, while count six is based on fraudulent suppression. Count seven, though cast in different terms, is apparently a restatement of count five. Defendants seek summary judgment on all fraud claims.

#### 1. *Fraudulent Misrepresentation*

Defendants argue that MSC cannot establish fraud on the part of Hartz. Under Alabama law, regardless of whether the representation is made willful-

ly, recklessly, or mistakenly, a plaintiff alleging fraudulent misrepresentation must prove four elements: (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied on the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance. *See Ala.Code* § 6–5–101 (1993); *George v. Associated Doctors Health & Life Ins. Co.*, 675 So.2d 860, 862 (Ala.1996). Defendants challenge elements one and four in their Motion for Summary Judgment. Defendants claim that MSC has no evidence that the Defendants misrepresented the quality of the soybeans sold to MSC. Additionally, Defendants argue that, assuming all other elements of the claim are met, MSC cannot show that it has sustained any damages in this case.

As to the first element, MSC responds with the deposition testimony of Moorer, Jr. in which he recalls that representatives of Hartz told him that "any seed beans that [Moorer, Jr.] got from Hartz would be of certified quality or better." Moorer, Jr. Dep. at 66, lines 18–19. Moorer, Jr. testified that he understood "certified quality or better" to mean that the Hartz seeds would have a germination rate of at least 80%. *Id.* at 181, ln. 8.

That testimony only shows that a genuine issue of material fact exists as to whether representations were made to Moorer, Jr. at all. The Defendants claim that there is no evidence of any misrepresentation on the part of Hartz. In fact, Defendants have come forward with evidence suggesting that the seed sold to MSC had a germination rate of at least 80%. *See* Def. Exh. P.

MSC has responded with evidence of its own suggesting that the germination rate of the seed delivered by Hartz was well below 80% at the time of delivery. For example, tests taken after the crop failure indicate a germination level well below 80%. *See* Pl. Exh. I. Defendants argue that such evidence is insufficient because it does not directly establish that the seed

had a germination level of below 80% at the time of delivery. This court disagrees with the proposition that such evidence is insufficient. Construing the evidence in the light most favorable to the Plaintiff, the evidence of low germination rates produced by MSC tends to show circumstantially that the seed was defective at the time of delivery. Furthermore, Dr. Weaver, in a statement attached to MSC's brief, states that "[t]here is ... little doubt in my opinion that the responsibility for poor emergence of the seed lots in question lies solely with Monsanto and Hartz Seed providing Mr. Moorer with seed of poor germination, poor vigor or both." Pl. Exh. H. Certainly the aforementioned evidence is not conclusive, but it is enough to create a genuine issue of material fact. MSC has produced other competent evidence tending to suggest that the seed sold was substandard, but it is unnecessary for this court to recite that information at this time. A genuine issue of material fact exists as to whether the Defendants misrepresented the quality of the soybean seed sold to MSC. It is not within the authority of this court to weigh the evidence and determine the truth of the matter.

As to the fourth element, Defendants argue that MSC cannot prove any damages from the 1998 soybean sales. Essentially, the Defendants contend that because MSC is not contractually obligated to pay its farmers for their lost crops, it could not have sustained any appreciable damage as a result of purchasing Hartz seed. Defendants' argument is without merit. MSC has, at a minimum, money damages for any defective seed it purchased for which it has not been reimbursed. Additionally, MSC can claim the value it would have received had the seeds been as represented. *See* Moorer, Jr. Interrog. at 1–2.

### 2. *Fraudulent Suppression*

To sustain a claim for fraudulent concealment or suppression under

Alabama law, a plaintiff must produce evidence establishing: (1) a duty on the part of the defendant to disclose material facts; (2) the defendant's suppression of material facts; (3) the defendant's knowledge of the facts and their materiality; (4) action by the plaintiff in reliance on the suppression; and (5) damages resulting from the reliance action. *See Ala.Code* § 6–5–102 (1993); *Hardy v. Blue Cross & Blue Shield,* 585 So.2d 29, 32 (Ala.1991). Defendants challenge only elements two, three, and five in their motion. As with the count alleging fraudulent misrepresentation, the Defendants argue that MSC cannot establish that the seeds were substandard when Hartz delivered them to MSC. Defendants also argue that MSC cannot show damages. For the same reasons discussed *supra,* these arguments are insufficient to support the Defendants' Motion for Summary Judgment as to this claim.

Defendants further contend, with regard to the fraudulent suppression claim, that they are due summary judgment because MSC cannot prove that the alleged representations of the Defendants' agents were concealed "willfully to deceive." Def. Br. at 19. Alabama law does not require a plaintiff bringing a fraudulent suppression claim to meet such a standard. Instead, the plaintiff must show that the defendant had knowledge of the material facts concealed. *See Hardy,* 585 So.2d at 32.

Here, MSC's evidence is thin. The only evidence in the record that the Defendants had knowledge of the alleged substandard seeds is in Plaintiff's Exhibit O. Exhibit O, a computer printout produced by Hartz in discovery, lists various Hartz soybeans and their germination levels prior to shipment. On that document, lot number HC–219 of H616 Hartz soybeans is listed as having a germination level of only 51%. Pl. Exh. O. In the margin next to the germination level are the words "DO NOT SHIP!!! LOW GERM!!!" *Id.* The document is dated April 30, 1998. At least part of that lot of H616 soybeans was delivered to MSC for replant purposes later that summer. Defendants have offered evidence that suggests that the germination problem with the H616s was remedied before delivery to MSC. *See* Def. Exh. N. However, this court concludes that MSC has succeeded in raising a genuine issue of material fact as to whether Defendants knew the product they delivered was defective.

Genuine issues of material fact exist as to all of the elements of the fraud claims that have been challenged by the Defendants. Accordingly, the Defendants' Motion for Summary Judgment is DENIED as to MSC's claims for fraudulent misrepresentation and suppression.

### E. *Federal & State Seed Law Claims* (Counts Eight, Nine, Ten, Eleven, Twelve, and Thirteen)

Defendants seek summary judgment as to all statutory seed claims brought by MSC. Neither MSC nor the Defendants have addressed the issue of whether there exists a private right to enforce these statutes.

Counts eight, nine, and thirteen allege labeling violations under Alabama Code sections 2–26–7(b)(2), 2–26–11(a)(2), and 7 U.S.C. §§ 1551 *et seq.* (the "Federal Seed Act"). The Federal Seed Act does not create an explicit private right of action. *See* 7 U.S.C.A. § 1596 (1999). Indeed, section 1596 states "[a]ny person who violates any provision of this chapter or the rules and regulations made and promulgated thereunder shall forfeit to the United States a sum, not less than $25 or more than $500, for each such violation, which forfeiture shall be recoverable in a civil suit brought in the name of the United States." *Id.* If there is to be a private right of action under the Federal Seed Act, it must be implied.

There is nothing in the record which suggests to this court that Congress intended to create a private remedy under the Federal Seed Act. "The intent of Congress remains the ultimate issue, however, and 'unless this congressional intent can be

inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.'" *Thompson v. Thompson*, 484 U.S. 174, 179, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (quoting *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 94, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)). If anything, the language of section 1596, which states that civil actions "shall be brought in the name of the United States," supports the position that no implied right of action was intended. This court concludes that the Federal Seed Act does not create a private right of action. *Accord Ren–Dan Farms, Inc. v. Monsanto Co.*, 952 F.Supp. 370, 374 (W.D.La.1997).

■ This court's analysis with regard to the state seed law claims is similar. No express cause of action is set up under the Alabama Code. Indeed, Article Four of Chapter Twenty–Six (Seeds) provides for an investigation and settlement procedure to process complaints against seed dealers. *See Ala.Code* §§ 2–26–70, 2–26–71, and 2–26–74 (1999). There is nothing before the court, Alabama case law, legislative history, or otherwise, suggesting that an implied private cause of action exists under the Alabama seed laws. Without more, this court is unwilling to imply such a cause of action. As counts ten, eleven, and twelve are also based on Alabama seed law, this court concludes that no claims are stated therein. Defendants' Motion for Summary Judgment as to all counts claiming violation of state and federal seed laws is GRANTED.

**2.** It does not appear that the Defendants contend that the limitation of remedy provisions apply to MSC's fraud claims, despite the fact that the drafter(s) of the provisions obviously intended that they would. This court reaches this conclusion based on the fact that the Defendants have set aside an entirely separate part of their brief to argue that MSC's claim for punitive damages on its fraud claims should not survive summary judgment. Nowhere have the Defendants explicitly argued

## F. Limitation of U.C.C. Remedies

■ Defendants do not seek summary judgment as to either MSC's claim for breach of express warranty (count two) or its claim for breach of contract (count four) claims. However, Defendants contend that their potential liability on those claims is limited to the purchase price paid by MSC. The confirmation of sale and the delivery tickets, all signed by Moorer, Jr. on behalf of MSC, include limitation of liability provisions in addition to the limitation of warranty provisions discussed *supra*. These provisions read in pertinent part:

**LIMITATION OF LIABILITY** (b) BUYERS EXCLUSIVE REMEDY SHALL BE FOR DAMAGES, AND SELLER'S TOTAL LIABILITY FOR ANY AND ALL LOSSES AND DAMAGES ARISING OUT OF ANY CAUSE WHATSOEVER (WHETHER SUCH CAUSE BE BASED IN CONTRACT, NEGLIGENCE, STRICT LIABILITY, OTHER TORT OR OTHERWISE) SHALL IN NO EVENT EXCEED THE PURCHASE PRICE OF THE GOODS IN RESPECT TO WHICH SUCH CAUSE ARISES OR AT SELLERS OPTION, THE REPLACEMENT OF SUCH GOODS, AND IN NO EVENT SHALL SELLER BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING FROM ANY SUCH CAUSE ... [2]

Def. Exh. F.

Alabama law specifically allows parties, by agreement, to fashion their own remedies. Section 7–2–719 provides:

that the limitation of remedy provisions might circumscribe a plaintiff's cause of action for fraud. This court has considered the matter, however, and concluded that it is unlikely that such limitation of remedy provisions could apply to a tort claim for fraud in Alabama. First, *Ala.Code* § 7–1–103 (1997), provides that the common law principles of fraud shall supplement the Commercial Code. Second, *Ala.Code* § 7–2–719 (1997) allows only for limitations of remedies available under the

Subject to the provisions of subsection (2) and (3) of this section and of Section 7–2–718 on liquidation and limitation of damages:

(a) The agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

*Ala.Code* § 7–2–719(1) (1997).

■ In the present case, there is a very specific provision limiting any recovery by MSC to the purchase price of the soybean seeds. Such stipulated remedies and limitations of consequential damages are frequently enforced where the injured party is a business person suffering a commercial loss. *See Southland Farms, Inc. v. Ciba–Geigy Corp.*, 575 So.2d 1077, 1079 (Ala.1991). MSC responds with two arguments: (1) that the limitation of liability clause is unconscionable; and (2) that it fails of its essential purpose. The court addresses these arguments in turn.

Section 7–2–719(3) states:

Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitations of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

*Ala.Code* § 7–2–719(3) (1997).

Under Alabama law, the court decides as a matter of law whether a contract clause is unconscionable. *See Ala.Code* § 7–2–302 (1997). In support of its argument, MSC relies primarily on another case from this district, *Majors v. Kalo Laboratories, Inc.*, 407 F.Supp. 20 (M.D.Ala.1975), where the court refused to enforce a limitation of damages clause, finding it to be unconscionable.

In *Majors*, the defendant-retailer sold soybean inoculant to the plaintiff-farmer. The plaintiff brought suit against the retailer claiming substantial damages due to crop failure resulting from an alleged defect in the inoculant. *See id.* at 21. The retailer defended on the grounds that the plaintiff was limited to the price of the product as stated on the product's package and advertising brochures. *See id.* at 21–22. The packaging as well as the brochures included claims that the inoculate was "100% guaranteed." *Id.* Evidence was submitted to the court which showed that, prior to shipment to the plaintiff, the defendant-retailer was aware that its product was experimental and of uncertain quality. *See id.* This information was not made known to the plaintiff.

The court, in finding that the limitations clause was unconscionable, focused on the fact that the inoculant's defect was latent and that it caused large and unforeseeable consequential damages to the plaintiff-farmer. The court found that "the remedy left to a purchaser after operation of the exclusion is grossly disproportionate to the expenditures an injured party would be expected to make in order to avail himself of the value of the product." *Id.* at 22–23. The court also found it significant that the retailer had not informed the plaintiff of the experimental nature of the product.

In contrast to the *Majors* decision, there is the more recent response of the Su-

Commercial Code. The Commercial Code, in turn, provides remedies for breach of contract and breach of warranty. A strong argument could be made that, in a case like the one before this court, the fraud claims raised are simply breach of warranty/contract claims in disguise. *See* 1 James J. White & Robert S.

Summers, *Uniform Commercial Code* § 10–5 (4th ed.1995). Though the line between contract and fraud may often be blurred, this court believes that a claim for fraud in Alabama is not governed by the limitation of remedies provisions of the U.C.C.

preme Court of Alabama to the Eleventh Circuit's certified question in *Southland Farms, Inc. v. Ciba–Geigy Corp.*, 575 So.2d 1077 (Ala.1991), which asked whether a particular limitations of remedies clause was unconscionable under Alabama law. The *Southland Farms* case involved the sale of agriculture chemical products by the defendant to a plaintiff farming corporation. After having used the chemicals on its potato fields, the plaintiff suffered damage to its crop caused by nut grass and potato rot. The chemicals had been intended to prevent such damage. *See id.* at 1079. The chemical containers were labeled with a limitation of remedy provision and an exclusion of consequential damages. *See id.* at 1077.

The Supreme Court of Alabama, in concluding that the limitation of remedy provision was enforceable, stated "the clear public policy in Alabama is to allow a seller to limit the remedies available to a buyer." *Id.* at 1080 (quoting *Puckett, Taul & Underwood v. Schreiber Corp.*, 551 So.2d 979, 983 (Ala.1989)). The *Southland Farms* decision treated favorably the analysis of the 5th Circuit Court of Appeals in *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199 (5th Cir.1987), where that court noted the risk-allocation function of exclusion clauses:

> The decision of a herbicide manufacturer to limit damages would seem, in the absence of other evidence, abundantly to fulfill this risk-allocation function, because the uncertainties inherent in the agricultural business are legion, and many of them, such as planting, cultivating, harvesting and marketing decisions, are uniquely within the control of the farmer -the . . . customer.

*Lindemann,* 816 F.2d at 204.

In concluding its response to the Eleventh Circuit, the Supreme Court of Alabama noted several reasons for why these limitation of remedies clauses have become accepted in the agricultural chemical industry: "(1) the vagaries of nature and the nature of such products; (2) the fact that the numerous factors affecting crop yield

are beyond the manufacturer's control; (3) the fact that if the potential for consequential losses were shifted to the seller, the cost of the product would be prohibitive; and (4) the fact that crop insurance is available to the farmer to mitigate any burdensome effect that such an exclusion would have." *Southland Farms,* 575 So.2d at 1081.

This court concludes, in light of the plain language of the U.C.C. and the *Southland Farms* decision, that the limitation of remedies clause in the present case is not unconscionable. The *Majors* opinion, while helpful to this court, involved a different factual scenario. There, the court was presented with abundant evidence that the defendant, while attempting to completely limit its liability, was knowingly misrepresenting the "experimental" quality of its product to the plaintiff. While MSC has come forward with some evidence that the Defendants in this case were aware that problems existed with some of the seeds prior to delivery, nothing in the record suggests that the limitation of liability provisions included in the contract served anything other than a risk allocation function. Indeed, MSC has a similar provision in its farmer contracts which states "we give no warranty expressed or implied as to the productiveness of any seeds we sell, and we will not be in any way responsible for the crop . . . Our liability in all instances is limited to the purchase price of the seed." Moorer, Jr. Dep. at 92, lines 12–18. As the *Majors* court noted in its opinion:

> Were this exclusion to operate merely to prevent [the Defendant] from becoming an insurer of crop yields, which are affected by numerous and incalculable variables of weather and other factors, a different case might be presented.

*Majors,* 407 F.Supp. at 22.

This court believes that this is a "different" case than *Majors*. It was the express intent of the drafters of Alabama's Commercial Code to allow sophisticated busi-

ness people to work out their own affairs. In the present case, there is an agreement between sophisticated businesses to allocate certain risks to the buyer, MSC. This allocation is explicitly allowed for under *Ala.Code* § 7–2–719(3) (1997). The factors listed in *Southland Farms* inform this court's decision. There is much more to the growth of a successful soybean crop than germination rates. If the Defendants were potentially liable for all consequential damages arising from crop failure, the cost of their products would be prohibitively expensive. Finally, means are available for buyers to mitigate any burdensome effects that a limitation of remedies provision might have. Here, MSC has largely avoided any potential difficulties by having a limitation of remedies provision of its own with its contract farmers.

 MSC argues in the alternative that the limitation of liability provisions fail of their essential purpose. Section 7–2–719(2) states, "where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title." *Ala.Code* § 7–2–719(2) (1997). "[W]here an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." *Id.* at Official Comment 1. Here, the purpose of the limitations provision in question was to allocate the risk of consequential damages to the buyer of the seed, MSC. Neither judge nor jury should lightly interfere with the agreement of the parties as to that allocation. *See* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 12–10 (4th ed.1995).

 Unlike the question of unconscionability under *Ala.Code* §§ 7–2–302 and 7–2–719(3), however, the question of whether a limitation of liability provision "fails of its essential purpose" is one of fact for the jury. *See Winchester v. McCulloch Brothers Garage, Inc.*, 388 So.2d 927, 928 (Ala. 1980); *Ex parte Miller*, 693 So.2d 1372,

1379 n. 10 (Ala.1997). Viewing the evidence in a light most favorable to the nonmovant, a jury might find that by the time it was discoverable that some seed was not as warranted and agreed to, it was too late for replacement seed to be planted. Therefore, this court concludes that a genuine issue of material fact exists as to whether the contractual provisions dealing with limitations of liability failed of their essential purpose. Accordingly, the Motion for Summary Judgment as to the issue of limitation of remedies is DENIED.

### G. *Punitive Damages*

 The Defendants seek summary judgment on MSC's claim for punitive damages under the counts alleging fraud. Defendants argue that MSC has not shown by clear and convincing evidence that the Defendants intentionally perpetrated a fraud against MSC. This court would agree with the Defendants if this was the standard that MSC was required to meet on a motion for summary judgment. It is not.

Alabama Code section 6–11–20 states in pertinent part:

(a) Punitive damages may not be awarded in any civil action ... other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff ...

(1) Fraud. An intentional misrepresentation, deceit, or concealment of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury (4) Clear and Convincing Evidence. Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability

as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt. *Ala.Code* § 6–11–20 (1993). By its own language, section 6–11–20 does not define the standard to be applied by the court at the summary judgment stage. *See Ex parte Norwood Hodges Motor Co., Inc.*, 680 So.2d 245, 249 (Ala.1996). Instead, it "defines the standard of proof for determining whether the trier of fact has, or had, the authority to award punitive damages." *Id.*

■ Because this is a diversity action, Alabama substantive law applies, but the standard for summary judgment is a procedural matter governed by federal law. In this case, MSC has presented evidence which tends to show that the Defendants knowingly misrepresented the quality of certain seed sold to MSC. This evidence, viewed in the light most favorable to MSC, is sufficient to avoid summary judgment on the issue of punitive damages, although the evidence may well prove to be insufficient to authorize such damages at trial. Accordingly, Defendants' Motion for Summary Judgment as to the availability of punitive damages on MSC's fraud claims is DENIED.

### H. *Mental Anguish Damages*

■ Defendants contend that a sole proprietorship has no claim for mental anguish damages. As discussed previously, there is no legal distinction between a sole proprietor and a sole proprietorship. Legally, MSC and Mrs. Francis G. Moorer are one and the same. MSC is entitled to claim mental anguish damages to the same extent they could be claimed in the name of Mrs. Moorer. Therefore, Defendants' Motion for Summary Judgment as to the availability of mental anguish damages is DENIED.[3]

---

**3.** The court, of course, expresses no opinion as to the propriety of awarding such damages.

### ORDER

For the foregoing reasons, it is ORDERED as follows:

1. Defendants' Motion for Summary Judgment is GRANTED as to Melvin M. Moorer, Jr., and judgment is entered in favor of the Defendants and against Melvin M. Moorer, Jr. The Motion is DENIED insofar as it claims MSC is an improper party to this action.

2. The Motion for Summary Judgment is GRANTED as to the implied warranty claims and as to all claims based on state and federal seed law.

3. The Motion for Summary Judgment is DENIED as to the misrepresentation claims, the fraudulent suppression claim, the effect of the limited liability provisions, the availability of punitive damages on the fraud counts, and the ability of MSC to claim mental anguish damages.

4. The case will proceed in the name of Moorer Seed Company on counts two, four, five, six, and seven.